UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| JOHN WAYNE COPELAND | * |
| | * |
| VERSUS | *   Case No: 1:13-CV-00514-S |
| | * |
| UNITED RENTALS, INC., et al. | * |
| | * |
| | * |

# MOTION FOR ENTRY OF JUDGMENT

Plaintiffs respectfully move for entry of Judgment against Defendant United Rentals, Inc. and would show the Court as follows:

1. On January 21, 2015 the jury in this matter returned a verdict against Defendant United Rentals and in favor of John Copeland for damages he sustained on October 30, 2012 while operating a Gehl telehandler.

2. The jury found that the negligence of United Rentals concerning maintenance of the locking plate proximately caused the occurrence or injury in question and assigned the percentage of responsibility attributable to United Rentals at forty percent and assigned no comparative fault to John Copeland. (*See* Verdict Form Questions 2(a), 5, Dkt. 159.)

3. The jury assessed total damages of $974,359.95. Based on the jury's assessment of fault to United Rentals, the award attributable to United Rentals is $389,743.98. (*See* Verdict Form Question 6, Dkt. 159.)

4. Plaintiff moves for entry of judgment against United Rentals for costs and damages in the amount of $399,208.90 which includes the above award, and $9,464.92 for prejudgment interest on past damages.

1

5.      The jury's verdict against United Rentals followed a three and a half day trial that centered on the question of why the carriage and forks affixed to the carriage became unattached to the Gehl telehandler on October 30, 2012.

6.      To answer this question, the jury was provided substantial testimonial evidence from multiple technical experts who explained the inner workings of the Dynattach locking system, eyewitnesses to the incident, Plaintiff and Plaintiff's co-workers, and United employees. Likewise, significant documentary and demonstrative evidence was introduced which included; multiple photographs of the telehandler locking mechanism and accident scene, animations depicting latching and unlatching of the locking mechanism, service and parts manuals from the telehandler manufacturer and United's service agreements and work orders.

7.      Multiple experts explained the mechanical functioning of the Dynattach system to the jury. In particular, detailed expert testimony demonstrated the following:

- The carriage that fell from the telehandler rests on top of a locking plate that holds the weight of the carriage when the carriage is in a horizontal position. (*See* Tr. Test. James Albert p. 20, attached hereto as Exhibit A)

- The leading edge of the locking plate rests against a horizontal bar welded to the carriage. (*See* Ex. A. Tr. Test. Albert p. 14)

- What keeps the locking plate from slipping past the horizontal bar is gravity, friction, and a spring that pushes the locking plate back into position when gravity and friction fail. (*See* Ex. A, Tr. Test. of Albert 15-16, 28, 36) (Tr. Test. John Johnson p. 40-41, attached hereto as Exhibit B)

- The system is held together by gravity when the system is static, but once it begins to vibrate, the dynamic motion causes the plate and the carriage to bounce independently of one another and the locking plate, by moving "a very small amount" no more than a quarter of an inch, can slip past the horizontal bar which is what occurred in this case. (*See* Ex. A, Tr. Test Albert p. 20-21) (Ex. B, Tr. Test. Johnson p. 40.)

- The spring holding the locking plate in place was over sprung and the locking plate was badly mushroomed and shortened. (*See* Ex. A, Tr. Test. Albert 24-25).

2

- The length of the locking plate is critical to how much distance it takes for the plate to clear the horizontal bar; a shortened plate clears the bar sooner. (*See* Tr. Test. Albert 24-25)

8. Taken together, the testimonial, documentary and demonstrative evidence presented at trial provided an extensive foundation for the jury to fully understand the Dynattach locking system and a basis for the jury to resolve the question of why the carriage became unattached from the Gehl telehandler. The evidence presented at trial provided a legally sufficient evidentiary basis for the jury's verdict against United and substantial evidence was introduced to support each element of Plaintiff's negligence claim. *See* F.R.C.P 50(a); *Am. Home Assurance Co. v. United Space Alliance*, 378 F.3d 482, 487 (5th Cir.2004).

*Testimony of Eddie Vasquez Demonstrated the Importance of the Locking Plate and Provided Extensive Evidence of United's Negligence*

9. The testimony of United Rentals service technician, Eddie Vazquez provided factual support for each element of Plaintiffs negligence claim against United. Vasquez had established his keen understanding of the Dynattach assembly and Gehl telehandlers. His testimony also recognized United's duty to utilize professional skill and judgment during inspection and repairs and evidences of a breach of those duties by failure to properly inspect the locking plate. Further Vasquez's testimony underscored the importance of the locking plate in securing the carriage attachment and provided substantial support for the jury's findings as to proximate cause.

10. Vasquez testified that his duties were to perform preventative maintenance and repairs on equipment that United Rentals rented to other companies. (*See* Tr. Test. of Eddie Vasquez p. 2, attached hereto as Exhibit C.) Vasquez acknowledged that the contract in place between United Rentals, (previously known as RSC) and Copeland's employer, Eagle Energy, provided that, "if RSC provides services to a customer, including training, repair or maintenance,

it will use professional skill and judgment in accordance with normally accepted industry standards." (*See* Ex. C, Tr. Test. of Vasquez p. 6-7.) Vasquez testified he understood he had to utilize skill and judgment when he was inspecting and repairing the fork. (*See* Ex. C, Tr. Test. of Vasquez p. 7.)

11. Vasquez testified that on October 9th, 2012, just twenty-one days before the October 30, 2012 involving John Copeland, he was called out to repair a bent metal fork on the Gehl telehandler that had been embedded in the highway while the telehandler was travelling. (Ex. C, Tr. Test. Vasquez p. 3.) Vasquez conceded that an incident involving enough force to bend a metal fork would place tremendous force and on the Dynattach system, and that, given the nature of the incident, he knew it was really important to make sure the Dynattach system was still in good working order. (*See* Ex. C Tr. Test. Vasquez p. 3, 6.)

12. Although Vasquez admitted the importance of inspecting the Dynattach assembly in light of the preceding event that bent the forks, Vasquez never unlatched the locking plate, never checked the tightness of the spring with his hand, and admitted he did not fully inspect the locking plate because <u>he could not see the leading edge of the locking plate during his inspection</u>. (*See* Ex. C, Tr. Test. Vasquez p. 7-8.) Vasquez admitted he never took the carriage off to check the Dynattach assembly. (*See* Ex. C, Tr. Test. Vasquez p. 6.)

13. Vasquez testified that the locking plate holds the bottom of the carriage in place, that the leading edge of the locking plate fits into a groove that holds the assembly in place, and that the bottom locking plate was extremely important to make sure that the carriage assembly stays on when it is tilted forward. (*See* Ex. C, Tr. Test. Vasquez p. 9, 11.) Vasquez admitted since he did not see the whole locking plate he was not sure whether it needed to be replaced. (*See* Ex. C, Tr. Test. Vasquez p. 54.)

14. After reviewing a picture of the locking plate taken after the incident, Vasquez admitted the photograph reflected the locking plate was "mushroomed" and that a brand new plate is supposed to be a perfect square. (*See* Tr. Ex. 49, Ex. C Tr. Test. Vasquez p. 10.

15. Vasquez conceded that replacing the locking plate and spring would not have been difficult. (*See* Ex. C, Tr. Test. Vasquez p. 19-20.) Perhaps most importantly, he testified that United never took the time to train him to detach the carriage and flip the locking plate over and look at the leading edge after a forceful impact. (*See* Ex. C, Tr. Test. Vasquez 52.) United's failure in this regard is critical.

16. The testimony of Eddie Vasquez demonstrated that pursuant to the contract between United and Eagle, and independent of that contract, United employees owed a duty to utilize professional skill and judgment in inspecting and maintaining the locking plate, springs, and locking mechanism. Vasquez's failure to inspect and repair the locking plate, or even look at its leading edge during the October 9, 2012 repair—a direct result of United's neglect in training him—provides substantial support for the jury's determination that United breached that duty. Vasquez's testimony regarding the mushroomed appearance of the locking plate, coupled with his testimony regarding the importance of the locking plate in assuring that the carriage assembly stays on when it is tilted forward, provides additional testimonial support for the jury's determination that the incident was proximately caused by United's negligence.

### *Expert Testimony Provided the Jury a Full Understanding of How the Locking Mechanism Functions and a Sufficient Basis to Assess United's Negligence*

17. In addition to Vasquez's testimony, the jury heard testimony from multiple experts. Four experts, Anthony Bond, Keith Hofer, Jim Johnson, and Jim Albert, provided testimony concerning the telehandler locking mechanism. While the ultimate conclusions of the experts differed on several points, the jury was provided significant technical information, as

discussed *supra at para 7*, regarding the functional aspects of the locking mechanism and how it attaches to the telehandler carriage. The jury had sufficient technical information concerning the functioning of the Dynattach system and the forces acting on that system to reach conclusions on how the forks became detached.

18. In addition, Jim Albert, a licensed Professional Engineer employed by Stress Engineering with twenty-eight years of experience, and a practice leader in the Stress's Measurement Control Group with supervisory authority over thirteen engineers, was called by the Plaintiffs. (*See* Ex. A, Tr. Test. Albert p. 1-2.)

19. Albert testified he utilized engineers from other disciplines, including PhD level mechanical engineers, to assist him with his a root cause analysis to investigate the causes of the incident of October 30, 2012. (*See* Ex. A, Tr. Test. Albert p. 8.)

20. Albert testified that the "basic question" he was trying to resolve while reviewing the incident was why the carriage became detached from the telehandler during the transport of the vehicle. (*See* Ex. A, Tr. Test. Albert p. 9-10, 17.)

21. To answer this basic question, he examined materials provided by the manufacturer, the vehicle and the latching mechanism of the Gehl telehandler involved in the accident, and a similar Gehl telehandler to determine how they work. (*See* Ex. A, Tr. Test. Albert p.18-19.) Albert considered alternate hypotheses regarding how the forks became detached. (*See* Ex. A, Tr. Test. Albert p. 18.) Albert took measurements of the telehandler, performed tests on the spring lock mechanism of the telehandler, developed a test protocol and reviewed; manuals, manufacturer drawings and designs, photographs of the telehandler and accident site, and witness testimony. (*See* Ex. A, Tr. Test. Albert p. 18-19.) He also performed and reviewed

calculations of the gravitational force necessary to cause the latching system to become disengaged. (*See* Ex. A, Tr. Test of Albert p. 27-28.)

22. After performing a root cause analysis, Albert concluded that dynamic motions created enough movement between the boom tip and the carriage to allow the latching mechanism to become unattached. (*See* Ex. A, Tr. Test. Albert p. 20.) Albert testified, utilizing an animation depicting the locking mechanism as an illustration, that if the carriage sustains a hard enough bounce it ends up pushing against the plate. (*See* Ex. A, Tr. Test Albert p. 21.) Albert testified when it pushes against the plate the product is designed so the locking plate can clear the edge of the lock, and that once this occurs, it has only an eighth to a quarter inch to clear and is no longer locked. (*See* Ex. A, Tr. Test. Albert p. 21.) Albert testified that the equipment was worn and that this contributed to the accident; specifically, he testified that the plate was shortened and badly mushroomed and that the spring was over sprung. (*See* Ex. A, Tr. Test. Albert p. 24.) Albert further testified the length of the locking plate is critical to how much distance it takes to clear the locking plate and testified "if you shorten it, it means the plate clears sooner." (*See* Ex. A, Tr. Test. Albert p. 25.)

23. Based upon his examination of the parts and on his knowledge of the critical role of the locking plate and spring, Albert testified United's maintenance of the spring and latch piece was inadequate. (*See* Ex. A, Tr. Test. Albert p 24, 74, 85.)

24. In a prior motion (Doc. 143), United argued Plaintiff provided insufficient evidence concerning the condition of the locking plate because Albert provided testimony about its condition without performing scientific testing.

25. This argument is without merit. As noted by numerous courts, experts do not necessarily need to perform scientific testing to support their opinions when their opinions are

based on a reasonable investigation, are the result of engineering expertise, and provide a reasonable link between the reviewed information and their conclusions. *See* e.g. *Sulak v. Am. Eurocopter Corp.*, 4:09-CV-651-Y, 2012 WL 6567237, at *9 (N.D. Tex. Dec. 17, 2012); *Tassin v. Sears, Roebuck & Co.*, 946 F.Supp. 1241, 1248 (M.D.La.1996).

26.     United's demand for scientific testing is rendered even more tenuous in light of the fact that United's own expert, Anthony Bond, also reached conclusions about the operability of the locking plate without scientific testing based on his experience and observations.(*See* Ex. 49 p. 33, Tr. Test. Bond p. 31, attached hereto as Exhibit D)

27.     Through expert and lay witness testimony, Plaintiff presented evidence that the leading edge of the locking plate in the subject telehandler was worn, mushroomed, and rounded, decreasing the ability of the locking plate to come in contact with the horizontal bar and increasing the chance that, when it came in contact, it could slip.

28.     Although Plaintiff was not required to produce an expert to establish its negligence claim against United, Plaintiff provided testimony from Jim Albert who, in accordance with the case law cited above, relied on his observation concerning the mechanical functioning of the locking mechanism, and understanding how the system operated, and based on his experience and knowledge, opined that the damaged spring and worn locking plate were contributing causes that allowed the locking plate to slip past the horizontal bar when the system was in dynamic motion. These conclusions are the result of engineering expertise and his investigation of the circumstances surrounding the accident and follow reasonably from Albert's observations about the condition of the locking plate and spring.

## CONCLUSION

29. The testimonial evidence, including multiple technical and engineering experts and United employee Eddie Vasquez, coupled with the documentary and demonstrative evidence introduced, provided the jury with ample evidence to determine that United committed negligence in failing to maintain the locking plate. Each element of Plaintiffs negligence claim duty, breach of duty, causation and damages, were supported by substantial evidence from multiple sources. The jury's verdict is consistent with and supported by the evidence adduced in this case. Accordingly, the Court should enter judgment as to the United's liability for the injuries sustained by John Copeland on October 30, 2012.

WHEREFORE PREMISES CONSIDERED, Plaintiff John Copeland moves for entry of judgment against United Rentals for costs, damages in the sum of $399,208.90 which includes $389,743.98 of damages awarded by the jury as reduced based on United's percentage fault as determined by the jury, and $9,464.92 of prejudgment interest on past damages.

Respectfully submitted,

**ARNOLD & ITKIN LLP**

*/s/ Caj Boatright*

———————————————————

Caj D. Boatright
SBN: 24036237
cboatright@arnolditkin.com
Patrick Sweeten
SBN: 00798537
psweeten@arnolditkin.com
Cesar Tavares
SBN: 24093726
ctavares@arnolditkin.com
6009 Memorial Drive
Houston, Texas 77007
Telephone: (713) 222-3800
Facsimile: (713) 222-3850
e-service@arnolditkin.com

**ATTORNEYS FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

I hereby certify that on February 4, 2015, I electronically filed the foregoing pleading with the Clerk of Court, using the CM/ECF system which will send notification of such filing to all counsel of record.

*/s/ Caj Boatright*

———————————————————

Caj Boatright